Mark R. Vermeulen [CSBN 115381]
Law Office of Mark R. Vermeulen
755 Florida Street #4
San Francisco, CA 94110.2044
Phone: 415.824.7533
Fax: 415.824.4833
markrvermeulen@gmail.com

Attorney for Defendant
AARON McARTHUR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>AARON McARTHUR,<br><br>　　　　　Defendant. | No.  3:19-cr-0267-EMC<br><br>**SENTENCING MEMORANDUM**<br><br>Date: July 22, 2021<br>Time: 11:00 a.m. / In-Person Hearing |

**INTRODUCTION**

This matter is set for sentencing following Defendant Aaron McArthur's guilty plea to Count One of the Indictment, a violation of 18 U.S.C. § 1951(a) (conspiracy to commit robbery affecting interstate commerce).  The charge carries a maximum term of 20 years imprisonment.  The parties have entered a plea agreement pursuant to Rule 11(c)(1)(C), agreeing that a sentence of 15 years imprisonment is a reasonable and appropriate disposition.  The Probation Officer, having undertaken a detailed, well-reasoned analysis, concurs.  The Court will make its own, independent determination.

One issue that remains is the Guidelines calculations.  As pointed out by the Probation Officer, the Guidelines calculations set forth in the Plea Agreement differ from those arrived at by the Probation Officer.  *See* Presentence Report (PSR) at 4, ¶ 3 (succinctly setting forth the difference in the calculations); *see also id.* at 11-15, ¶¶ 33-76 (detailing the Guidelines calculations).  Upon further review, counsel for Mr. McArthur believes that the Probation Officer's calculations are correct, resulting

1    in a Total Offense Level of 35, rather than the Total Offense Level of 34 set forth in the Plea Agreement.

2           In determining the appropriate disposition, the Court will consider, *inter alia*, the principle of

3    comparative culpability.  This includes a review of the dispositions of the defendants charged and

4    sentenced in the related case United States v. Beal, *et al.*, No. 3:18-cr-0179-EMC (Beal).  Per Ninth

5    Circuit authority, in assessing comparative culpability, the Court also must consider all acts and

6    omissions undertaken within the broader criminal enterprise, including participants in the criminal

7    scheme not charged or not even known.  Doing so further demonstrates that the disposition proposed by

8    the parties and recommended by the Probation Officer is reasonable and appropriate.

9           Mr. McArthur also respectfully requests that the Court recommend to the Bureau of Prisons

10   (BOP) that he be permitted to participate in the Residential Drug Abuse Treatment Program (RDAP),

11   and that he be designated to a facility near Richmond, Virginia.

12                                              **DISCUSSION**

13   **I.     Essential Legal Framework**

14          As the Court is aware, in determining the appropriate sentence, courts must correctly calculate

15   the applicable Guidelines range as the "starting point" and then assess the factors set forth in 18 U.S.C. §

16   3553(a) to fashion a sentence that is sufficient, but not greater than necessary, to achieve the aims of the

17   statute.  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).

18          Criminal "punishment should fit the offender and not merely the crime."  *Williams v. New York*,

19   337 U.S. 241, 247 (1949).  That requires "the sentencing judge to consider every convicted person as an

20   individual and every case as a unique study in the human failings that sometimes mitigate, sometimes

21   magnify, the crime and the punishment to ensue."  *Gall v. United States*, 552 U.S. 38, 52 (2007)

22   (quotations omitted); *see also United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985) (factors

23   detailed in § 3553(a) assist the Court in fulfilling the mandate to make "an individualized assessment of

24   a particular defendant's culpability rather than a mechanical application of a given sentence to a given

25   category of crime").

26   / / /

27   / / /

28   / / /

## II.     Sentencing Guidelines Calculations

The Probation Officer points out two differences between the parties' Guidelines calculations and the PSR's calculations: (1) the multiple count adjustment under U.S.S.G. § 3D1.4; and (2) the enhancement under U.S.S.G. § 2B1.3(b)(4) concerning the fourth robbery (referred to as Group Four in the Plea Agreement (at p. 8, lines 12-15) and as Count Group 1D in the PSR (at p. 14, ¶ 63 in the PSR). *See* PSR at 4, ¶ 3.  Counsel for Mr. McArthur believes that the Probation Officer's calculations are correct, and that the proper Total Offense Level is 35.

## III.    Determining the Appropriate Sentence in the Context of Comparative Culpability: Considering the Offense Conduct of Mr. McArthur, Along With the Conduct of the Others Who Were Involved, Including Those Charged and Sentenced in United States v. Beal, *et al*, As Well As Those Who Participated In The Criminal Scheme But Were Never Charged

### A.     Comparative Culpability Vis-à-vis the Beal Defendants

Mr. McArthur is genuinely sorry and sincerely regrets his involvement in these home invasion robberies in early 2018.  He knows that his actions were wrong and that by doing what he did, he caused great harm to the persons who suffered from the actions visited upon them.  As noted by the Government earlier in the related case of United States v. Beal, *et al.* and by counsel for the various defendants in Beal who previously were convicted and sentenced, and as made clear by the submissions of those harmed (*see* Victim Impact section of the PSR, at 9-10), the crimes were executed in an absolutely terrifying manner and the effects on the victims are significant and enduring.  By counsel's discussion here, he does not mean to diminish or minimize what Mr. McArthur did.

Still, in undertaking the assessment mandated by the Sentencing Guidelines and framed by 18 U.S.C. § 3553(a), this Court rightly considers comparative culpability.  In the present case, as noted in the PSR, this applies to the defendants in Beal.  The Probation Officer expressly takes this into consideration in addressing the sentence proposed in this case as to Mr. McArthur, noting among the factors that weigh in favor of a 180-month sentence for Mr. McArthur that "this sentence is equitable in light of the sentences received by the defendant's co-participants."  PSR, Sentencing Recommendation at 2, 6th full ¶.  Counsel will not attempt to lay out the bases for comparison between the present case and the sentences imposed in Beal, as the Court is well aware of the case factors and the individual factors that went into the Court's determinations of the sentences in that case, and how they compare to

the proposed sentence in the present case.

**B.      Comparative Culpability Vis-à-vis Other Persons Known to Have Been Involved in the Criminal Scheme Who Were Not Charged**

While comparison to defendants charged and sentenced in the related <u>Beal</u> case is appropriate, the concept of comparative culpability goes further, by which the acts of the particular defendant before the Court must be viewed in the larger context of all other participants in the criminal scheme. *United States v. Rojas-Millan*, 234 F.3d 464, 473 (9th Cir. 2000). By this, the Court must consider all acts and omissions undertaken within the criminal enterprise, even as to participants in the criminal scheme not charged or not even known. *Id.* at 472-473; *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1267 (9th Cir. 1998) ("[T]he relevant comparison is between the defendant's conduct and that of the other participants in the same offense."), *citing United States v. Benitez*, 34 F.3d 1489, 1498 (9th Cir. 1994); *see also United States v. Petti*, 973 F.2d 1441, 1447 (9th Cir. 1992). While this aspect of comparative culpability was not addressed in <u>Beal</u>, it merits consideration here.

In the present case, considerable discovery has been produced in the form of law enforcement reports along with records obtained in the Government's investigation that demonstrate the involvement of a number of additional participants in the criminal scheme who have not been charged. While the discovery concerning the involvement of these persons is extensive and detailed, counsel here will summarize just some points as to the most culpable additional participants.

**1.      Y.G.[1]**

Foremost among those involved but not charged is Y.G. Operating from within his cell in a California state prison and using the cell phones he possessed, Y.G. was a – if not <u>the</u> – key coordinator of the planning and execution of the robberies. Y.G. had telephone communications with various of the perpetrators of the February and March 2018 robberies (as well as uncharged co-participants) on the days of the robberies and the days surrounding the robberies, including extensive communications with one of the lead perpetrators of the February robberies and one of the lead perpetrators of the March robberies. For example, text messages later recovered from the cell phone of one of the February

---

[1] While the names of the uncharged participants often are set forth in the discovery, counsel will refer to them herein by their initials.

perpetrators showed that on February 8, 2018 at approximately 0104 hours, Y.G. sent texts to that perpetrator with addresses for residences on Fulton Road and Melcon Lane.  These are the locations of the robberies and shootings that would occur later that same morning.  When apprehended, that perpetrator disclosed that through these text messages, he had been ordered to commit the robberies at these locations.

By way of another example, in connection with the March 2018 robberies, text messages from Y.G. (recovered from one arrested perpetrator's cell phone) involve what appear to be real-time efforts to assist the perpetrators' escape immediately after the robberies.  One text message read "I'm on my way to pick you up. I am in a black benz. Dull angel and swag are safe and in my car right now. Text me a address to pick yo."  The Sonoma County Sheriff's Office (SCSO) detective's report addressing this text message noted that "[t]his was obviously significant. This led me to believe [REDACTED]'s co-conspirators were with the subject who possessed this cell phone number.  Additionally, it lead [sic] me to believe this number may belong to a higher ranking person in the criminal organization, specifically [S.G.]."  From context, it also appears that this may have involved a triangulation of communications at the time with Y.G.'s brother, S.G., who is discussed, *post*.

At one point, a search was conducted of Y.G.'s prison cell, following the execution of an "exigent ping" warrant on a phone number tied to the February 2018 robberies.  Execution of the ping warrant disclosed that the location of the phone was Corcoran State Prison (CSP).  Through coordination with CSP, law enforcement searched Y.G.'s prison cell, seizing 17 cellular phones (12 of which appeared to be brand new and never used), one pound of processed marijuana, and two cans of pepper/oleoresin capsicum spray.  The SCSO detective would observe at the time that "[t]hroughout the investigations it has been described that [Y.G.] has been orchestrating much of the crimes being investigated from state prison via cellular phone.  [Y.G.] has had his cell searched on more than one occasion, at Corcoran State Prison, and has been found to be in possession of cellular phones."  A Cellebrite download of one of Y.G.'s phones disclosed over 90 photographs of homes and properties in Sonoma County in the cellphone's cache memory.  Review of phone records also disclosed that Y.G. watched and saved media coverage of the March 2018 robberies, including the manhunt for the

SENTENCING MEMORANDUM - No. 3:19-cr-0267-EMC

1  conspirators as they were identified and on the run (to include the search for perpetrator A.H., who

2  escaped for a period of time), with 30 different links to media coverage of the March home invasions in

3  Y.G.'s cell phone's cache memory.

4     **2.**  **S.G.**

5     A report drafted by one of the lead SCSO detectives in the investigation of the robberies

6  characterized S.G. as "a higher ranking person in the criminal organization."[2]  Phone records

7  demonstrate that S.G. was connected to more than one of the perpetrators of the February 2018

8  robberies.  In a post-arrest interview with one of the perpetrators of the February 2018 robberies, that

9  person provided information concerning others who were responsible for orchestrating and facilitating

10  the robberies, which led the SCSO detectives to telephone and social media records implicating S.G.  As

11  noted above in the discussion regarding his brother (Y.G.), S.G. was involved in the real-time efforts to

12  assist the perpetrators' escape immediately after the March 2018 robberies.

13     At one point in the investigation, S.G. was identified as possibly the person captured on Walmart

14  surveillance video who purchased the duct tape used during the robberies.

15     One of the participants in the criminal scheme interviewed by law enforcement aptly described

16  S.G. as "using other people for his criminal activities and exposing himself very little when facilitating

17  criminal activity for the overall organization."

18     This was not the first time that S.G. had come under the scrutiny of law enforcement.  Earlier, he

19  had been identified as a person of interest by the Santa Rosa Police Department (SRPD) concerning a

20  matter not disclosed by the discovery, leading the SRPD to place a GPS tracker on S.G.'s Kia vehicle,

21  which S.G. later sold to another uncharged participant, M.S. (who is discussed, *post*), disclosing to M.S.

22  that he (S.G.) had found the GPS tracker and removed it.  S.G. also was involved, along with M.S. and

23  M.E. (discussed, *post*) in the acquisition and distribution of firearms, including AR-15 assault rifles and

24  high capacity magazines.

25

26

27

28    [2] *See also* the discussion in the section addressing Law Enforcement's Knowledge of the Personnel and Structure of the Criminal Organization, *post*, section III.B.5.

SENTENCING MEMORANDUM - No. 3:19-cr-0267-EMC

3. **M.S.**

The lead SCSO detectives interviewed M.S. at length on February 19, 2018.  He implicated himself, Y.G., S.G, M.E., and others in extensive criminal activity, including the acquisition and transportation of firearms and high capacity magazines, and further including the home invasion robberies, concerning which he told law enforcement that "to his knowledge, the home invasions being committed by this criminal organization had been occurring for several months."

4. **M.E.**

During the relevant time period, M.E. was the girlfriend of Y.G., and SCSO detectives also determined that M.E. had been in a relationship with Y.G.'s cellmate at Corcoran State Prison.  M.E. worked at local Sonoma FedEx stores and through this connection helped facilitate the out-of-state acquisition, shipment and delivery of firearms for the criminal organization, often at the direction of Y.G.  These firearms included fully-assembled AR-15 assault rifles, high capacity magazines, and handguns.  M.S. was knowledgeable about M.E.'s involvement in the transactions involving the firearms and her helping to facilitate firearms transactions: at least one of the brands of firearms (a 9mm Llama handgun) was described by M.S. as having been delivered to him by M.E., and that same type of handgun later would be recovered from one of the arrested perpetrators following the February 2018 robberies and homicide.

5. **Law Enforcement's Knowledge of the Personnel and Structure of the Criminal Organization**

Through the investigation, law enforcement obtained and pieced together information concerning the criminal organization, its personnel, and its operations.  The report of an interview the SCSO detectives conducted with M.S. on February 19, 2018, demonstrates the significant information that law enforcement developed in this regard:

> Throughout this interview, [M.S.] described a criminal organization with [Y.G.] being at the top and [S.G.] being below [Y.G.] and reporting directly to and receiving orders from [Y.G.].  [M.S.] described all other subjects in the criminal organization as reporting to [S.G.] and on occasion, directly to [Y.G.].  Some of the subjects [M.S.] described were: [Y.G.]'s 'side chick' ([M.E.]), [A.D.] ([Y.G.] and [S.G.] s cousin; aka "AD") and [M.H.].  [M.S.] further described that [Y.G.] was currently in prison and running the criminal organization from inside of prison through the use of cell phones which he had possession of in prison.

SENTENCING MEMORANDUM - No. 3:19-cr-0267-EMC

1    AM-SR-0013 at AM-SR-0021.

2         In a report drafted approximately three weeks later (which concerned the March 2018 robberies),

3    the SCSO detectives similarly discussed the criminal organization, stemming from a review of the recent

4    call history of one of the arrested March 2018 perpetrators:

5              While looking through [REDACTED]'s recent call history, [REDACTED]
               had called and received calls, numerous times, from a contact labeled, Cali
6              Mula.  These calls had occurred in the hours following the home invasion
               robberies.  This contact had a phone number of: (XXX)XXX-1604. I
7              found this contact name to be extremely significant.  Cali Mula was an
               alias used in a prior set of home invasion robberies and a homicide which
8              had occurred on 02/08/2018.  During this prior investigation, the crimes
               being investigated had been linked to a criminal organization which was
9              being orchestrated by a subject who went by the alias of, "Mula" and "Cali
               Mula."  This subject was identified as [Y.G.].  [Y.G.] had yet to be
10             contacted in connection with the prior investigation.  Additionally,
               [Y.G.]'s brother, and co-conspirator, was identified as [S.G.]  [S.G.] had
11             also yet to be contacted.

12   AM-1123 at AM-1168.

13             **6.     Conclusion re: Known Participants in the Criminal Scheme Who Have Not
                        Been Charged**

14

15        Pursuant to *Rojas-Millan* and related Ninth Circuit authority, the Court's comparative culpability

16   analysis should include consideration of the above.

     **IV.    Requests for Recommendations by the Court to the Bureau of Prisons**
17

18        Mr. McArthur respectfully requests that the Court make two recommendations to the Bureau of

19   Prisons.  First, he requests that the Court recommend that he be permitted to participate in RDAP.[3]  As

20   noted by the Probation Officer, at the time of these offenses Mr. McArthur was using marijuana daily,

21   he recognizes that this substance has created significant problems for him, and he is interested in

22   receiving substance abuse treatment and counseling.  PSR, Sentencing Recommendation at 2, 3rd full ¶.

23        The second recommendation Mr. McArthur seeks is that the Court recommend that he be

24   designated to a facility near Richmond, Virginia.  This is where family members reside, and the Court is

25   no doubt aware of the benefit to individuals and to society that flows from familial connection during

26   _____

27        [3] As the Court likely is aware, Mr. McArthur's participation in RDAP will not result in a
     reduction of the time he must serve, as persons convicted of an offense involving a firearm are not
     eligible for early release as a result of their having successfully completed RDAP.  *See* BOP P.S.
28   5331.02, implementing 18 U.S.C. § 3621(e).

incarceration, and how such a connection reduces the likelihood of recidivism. *See* E. Mooney & N. Bala, The Importance of Supporting Family Connections to Ensure Successful Re-Entry, R Street Shorts No. 63, Oct. 2018, available here: https://www.rstreet.org/wp-content/uploads/2018/10/Final-Short-No.-63-1.pdf.; A. Friedmann, Lowering Recidivism through Family Communication, Prison Legal News, Apr. 2014, available here: https://www.prisonlegalnews.org/news/2014/apr/15/lowering-recidivism-through-family-communication/ ("Studies have consistently found that prisoners who maintain close contact with their family members while incarcerated have better post-release outcomes and lower recidivism rates.").

## CONCLUSION

Counsel for Mr. McArthur respectfully requests that the Court impose a sentence of 180 months imprisonment with whatever other terms and conditions the Court deems appropriate.

Dated: July 15, 2021                                    Respectfully submitted,


                                                       /S/ _____
                                                       Mark R. Vermeulen
                                                       Attorney for Defendant
                                                       AARON McARTHUR